1
2
3
4
5
6
7            IN THE UNITED STATES DISTRICT COURT FOR THE

8                    EASTERN DISTRICT OF CALIFORNIA

9

| | |
|---|---|
| UNITED STATES OF AMERICA, | 1: 01 CV F -5167 OWW DLB |
| Plaintiff(s), | ORDER RE SOUTHERN CALIFORNIA EDISON'S MOTION TO STRIKE EXPERT OPINIONS OR TO PERMIT EDISON TO FILE A SUPPLEMENTAL/REBUTTAL EXPERT REPORT |
| v. | |
| SOUTHERN CALIFORNIA EDISON, et al., | |
| Defendant(s). | Doc 215 |

16

17        Pursuant to notices filed on March 25, 2005, April 5, 2005 and April 14, 2005[1],

18  Defendant Southern California Edison ("Edison") seeks an order striking all of the new and

19  additional opinions offered by the government's expert, Richard Ford ("Mr. Ford"), at his

20  deposition on December 14, 2004.  Alternatively, Edison seeks leave to file a

21  supplemental/rebuttal expert report(s) (which may involve disclosure of an additional expert) that

22  addresses and responds to the new and additional opinions offered by Mr. Ford at his deposition.

23  The parties filed a joint stipulation re discovery dispute pursuant to Local Rule 37-251 on April

24  27, 2005.  The matter came on regularly for hearing on April 29, 2005 in Department 5 of the

25  above-entitled court.  Appearing on behalf of the United States was Kirk E. Sherriff.  Appearing

26

27        [1]Edison filed an amended notice on April 5, 2004 and a second amended notice on April 14, 2005.

28                                            1

on behalf of Edison was Stevens & O'Connell, LLP by attorney Craig C. Allison.  Having

considered the papers filed by counsel, as well as the arguments of counsel and the Court's file,

the Court issues the following order.

## BACKGROUND

The United States filed this action seeking to recover damages resulting from the "Big

Creek Fire" in the Sierra National Forest which the U.S.A. alleges originated on August 24, 1994

on the grounds of SCE's hydroelectric generation facilities known as Big Creek Powerhouses

Nos. 2 and 2A.  SCE generates power at Big Creek 2/2A under two Federal Energy Regulatory

Commission (FERC) licenses, denominated by their FERC project numbers, Project Nos. 67 and

2175.

On September 27, 2002, the Court issued a scheduling order setting the deadline for

written designation of experts pursuant to Federal Rule of Civil Procedure 26(a)(A) and (B).  On

March 9, 2004, the Court granted the parties' joint application to modify the scheduling order

which required the parties to disclose experts by July 15, 2004 and provide supplemental expert

disclosures by July 30, 2004.[2]  The parties thereafter agreed to extend these deadlines by two

weeks.  The United States timely disclosed and provided Mr. Ford's report in July 2004.  Mr.

Ford's resume indicates that he is an experienced wildland fire scene investigator, which includes

evaluating and determining the cause and point of origin.  Edison's counsel deposed Ford on

December 14, 2004.

This dispute centers around Edison's contention that at his deposition, Mr. Ford provided

untimely additional opinions that were not contained in his report as to what he now claims was

the precise point of origin of the Big Creek fire.  Edison argues that these new opinions should be

excluded from evidence as violative of Rule 26 and Judge Wanger's Scheduling Order.  Edison

---

[2]On February 6, 2005, the Court modified the scheduling order based on Edison's withdrawal of admissions concerning the applicability of the FERC licenses in this case.  The Court ordered that further discovery, including further disclosures of experts shall be limited to the issues raised by the withdrawal of the admission by Edison.

1    also argues that Mr. Ford's new opinions do not constitute "supplemental disclosures" under

2    Rule 26(e) since the opinions were developed after the expert reports were due and submitted.

3    At a minimum, Edison argues that it should be entitled to offer rebuttal expert reports to Ford's

4    untimely deposition opinions.

5        The United States maintains that Edison's motion is an attempt to introduce untimely

6    expert reports, including one from a previously undisclosed expert.  The United States argues

7    that Ford's opinions are not "new" and not beyond the scope of the opinions set forth in his

8    report dated July 13, 2004.  Even assuming Ford's testimony modified his report in any material

9    respect, the United States contends the supplemental disclosure provision in Rule 26(e)(1)

10   authorizes such supplemental disclosure at deposition.  The United States maintains that

11   Edison's untimely attempt to reopen this issue on which discovery is closed would be prejudicial,

12   particularly as new government counsel is already required to focus a disproportionate amount of

13   time on the issues on which discovery was specifically reopened by Judge Wanger as a result of

14   Edison's late withdrawal of admissions concerning the applicability of the FERC licenses in this

15   case.

16   **DISCUSSION**

17   **A.**      **Mr. Ford's July 2004 Report**.

18        In his July 2004 report, Mr. Ford offered the following opinion regarding the point of

19   origin of the Big Creek Fire:

20      <u>Initial Fire Spread</u>

21      The base of the slope adjacent to the transformer enclosure is now covered with a
      coating of sprayed concrete, preventing examination of residual fire vegetation to

22      determine the point of origin of the wildfire.  <u>However, the cupping of the top of
      the stub on its downslope face is consistent with frontal fire spread uphill from the</u>

23      <u>substation.  (See photo 11)</u>.
      Above the secondary enclosure is a cleared area to channel surface water drainage

24      around the substation enclosure.  It also serves as a cleared pathway to the hillside
      above which remains largely undisturbed since the fire.  Residual evidence created

25      by the fire's passage within this area is still undisturbed and identifies frontal fire
      spread from the substation below.  These fire spread indicators involve rock

26      stains, charred lichen, fallen unburned limbs and residual burned stubs of trees
      and shrubs.  (See photos 24-32)(Refer to sketch 5)

27

28                         3

The frontal advance of the fire up the slope is also identifiable by the existing appearance of tree crowns at the visible top of this slope where the initial fire was being observed.  (See photos 33 & 34)
The visual evidence creates a widening "vee" pattern of fire spread uphill from the area of the transformer enclosure, confirming that the wildfire started at a low slope level in the vicinity of the transformer enclosure.
Small, surface fuels on this steep slope would be expected to be ignited easily on the fire date in recognition of: (1) exposure to morning solar heating; (2) hot, dry, mid-day weather in late summer; (3) summer-long drying of annual vegetation; and (4) low residual fuel moisture in the foliage of perennial species.  The rapid spread of the fire to the tip of the ridge confirms the severity of the fire danger at the onset of the fire. (emphasis added.)

Ford Rept. at p. 3.

**B.     Mr. Ford's December 14, 2004 Deposition Testimony.**

On September 7, 2004, Mr. Ford requested that prior to his deposition he be provided with "8x10 color copies (from McPhail's negatives for quality purposes) of Bates Nos. 009947, 009961, 009963, 009964 and 009974."  Allison Declaration, Exhibit M.  Based on his review of these higher quality photographs, at his deposition on December 14, 2004, Mr. Ford was able to detail on exhibit photographs used during the deposition, a more specific area of origin and spread of the fire.  *See* Ford Deposition, p. 105-107 and Allison Declaration Exhibit E.  Mr. Ford's more detailed opinion prompted the following exchange:

Q: Let me ask you this, because you have testified with some specificity as to – not a specific dot, but at least a very small area where you say was the point of origin of the fire, correct?  And you testified about it earlier, is that right?  Right? And you marked it on the photographs.

A: Where I marked on the photographs is where I'm saying basically this is your area of – that I know an origin occurred, and spread up slope within the enclosure, and beyond.

Q: And that is your opinion today, as you sit here, to a reasonable degree of scientific certainty, is that correct?

A: That's correct.

Q: Did you hold that same opinion as to the area of origin or ignition, as we've discussed earlier, at the time you put this report together?  Your report that we're referring to as Exhibit 10.

A: I think, when I put this report together, I didn't have the advantage of looking at quality photographs that showed the corridor, and it's only based upon these photographs that I was able to establish that the – that a point of ignition behind

4

the substation.

Q: Did you have any discussion after doing your report, with Ms. Maccione or anybody else, in which you were asked to more narrowly focus and come up with an opinions as to a point of origin?

A: No, I don't think she asked me, "Did it start within 30 feet?" That's one of the things she would ask me. (emphasis added)

Ford Deposition at 211:19-25 - 212:1-24.

Q: And at the time you did your report you had not been able to come to any opinion or conclusion as to the area of ignition, as we discussed earlier today, is that right?

Ms. Maccione: Objection.  Characterizes the testimony.

The Witness: Precise point of ignition, yes.  But as far as being a determination, it was well within that lower area of the enclosure of the slope, yes.  I was confirmed – I could confirm that because I found a stub, now covered with Gunite, that's well within that 30-foot area, and showing fire spreading uphill from that spot.  So it was with knowledge and confirmation that I knew that to be a fact, but I could not have – at that time hadn't tried to – wasn't able to get the precise point until I got the quality photographs.

Q: And then once you got the photographs, which are the ones we talked about earlier today –

A: Extensively today.

Q:  – you analyzed then and you were able to further narrow down the area of ignition that is your opinion?

A: The . . . the spread indication on the stub was not a point of origin, but it just told me the fire origin was below that point. In more close proximity to the back of the transformers.  It was only when I got quality photographs that I was able to pinpoint it beyond that point to the point that we've identified today.

Q: If you had the quality photographs prior to the time you generated your report, would you have been more specific in your report as to the point of origin, along the lines we talked about in this deposition?

A: Absolutely.  Again, that was visible evidence at the time of the fire, and it would have been an influence.

Ford Deposition at 215:25 - 217:1-12.

///

///

///

5

C.      **Edison's Motion to Strike**.

Rule 26(a)(2) requires the expert's report to contain "a complete statement of all opinions to be expressed and the basis and reasons therefor . . . " Fed.R.Civ.P. 26(a)(2).  Full disclosure must be made of everything to be covered in the expert's direct examination and anything considered by the expert.  *See* Adv. Comm. Notes to 1993 Amendments to FRCP 26(a)(2).

The United States timely disclosed and served Mr. Ford's written report in July 2004. However, at his deposition in December 2004, Mr. Ford provided testimony regarding the precise point of origin of the fire beyond that which was provided in his report.  The testimony significantly narrows the area in which Mr. Ford opines the fire originated and Mr. Ford testified that he was only able to form his opinion as to the precise point of origin of the fire after he received the higher quality photographs, which he requested in September 2004 letter to Ms. Maccione.  The more detailed analysis of the point of origin is admittedly information that Mr. Ford would have put in his report if he had the higher quality photographs prior to generating his report therefore required by Rule 26(a)(2).

Mr. Ford's more specific opinion does not constitute supplementation.  Rule 26(e) requires supplementation when a "party learns that in some material respect the information disclosed is incomplete or incorrect."  Mr. Ford's report was not incomplete or incorrect, he simply failed to do the more detailed examination of the photograph which would have enabled him to provide his later arrived at opinion within the disclosures deadlines.  Rule 26(e) does not cover this situation.  The purpose of the supplementary disclosures is to supplement earlier disclosures regarding the designated experts.  Designating a new expert or new opinions after the disclosure deadline is not allowed as a "supplemental disclosure."  *See Keener v. United States* 181 FRD 639, 642 (D MT 1998).

A party who fails to properly disclose its expert and their reports may be barred from using on direct examination any exert testimony not so disclosed:

> **c) Failure to Disclose; False or Misleading Disclosure; Refusal to Admit.**

**(1)** A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions.

Fed.R.Civ.P. 37(c)(1).

The United States offers no justification for failing to timely disclose Mr. Ford's more detailed opinion regarding the origin of the fire.  While the Court finds no evidence of bad faith on the part of the Untied States, Mr. Ford's testimony at his deposition is based on work that he could and should have performed prior to submitting his report or at least in a supplemental report well in advance of his deposition.  Indeed, Mr. Ford requested the higher quality photographs in September but it was not until the deposition in December that his more specific opinion was provided to Edison.  Exclusion of critical evidence is a harsh sanction, especially in the absence of bad faith.  However, allowing Mr. Ford to offer his opinion at trial regarding the precise point of origin of the fire using the high quality photographs would necessitate giving Edison the opportunity to respond to this opinion.  Based on the representations by counsel at the hearing, the Court finds that a more practical solution is to grant Edison's motion to strike the additional opinions offered by Mr. Ford at his deposition thereby limiting both parties to the expert opinions that were disclosed in accordance with the scheduling order.[3]  In addition, eliminating the additional testimony by Mr. Ford at his deposition renders Edison's motion to file a supplemental/rebuttal expert report moot.[4]

Notwithstanding the Court's determination that Mr. Ford's initial report did not put

---

[3]At the hearing, counsel for the United States suggested that the United States would be willing to forego the additional testimony by Mr. Ford in lieu of allowing Edison to file a supplemental expert report..

[4]Indeed, the Court notes that the supplemental/rebuttal report proposed by Edison goes beyond providing rebuttal opinions to Mr. Ford's more specific opinion as to the point of origin of the fire.  Mr. Ben Hull not only opines that it is not possible to identify the area described by Mr. Ford as a specific point of origin but also that, "*there were very likely multiple points of ignition higher up on the slope.*"  *See* Allison Declaration, Exhibit F, p.1-2 (emphasis added).

Edison on notice of his more detailed opinion as to the precise point of origin of the fire, a fair

reading of the Report does put Edison on notice of his opinion that the fire started within the

transformer enclosure at the bottom of the slope.  The Report describes the substation containing

the transformers and power grid as located adjacent to the power house access road within view

of the power house and built against a steep (47 degree) hillside.  Ford Report at p. 1.  Mr. Ford

states that the transformers and power grid are installed on a concrete slab and are enclosed by a

wire fence approximately 30 yards long (E-W) and 25 feet deep.  *Id*.  He then describes a

secondary wire enclosure built on the slope of the hillside behind the substation, the top of which

extends about 175 feet upslope from the base of the slope.  Ford Report at p. 2.  He opines that

the fire spread "uphill from the substation" and that the "visual evidence creates a widening

"vee" pattern of fire spread uphill from the area of the transformer enclosure, confirming that the

wildfire spread at a low slope level in the vicinity of the transformer enclosure."  Ford Report at

p.3.  Based on his description of the substation, transformer enclosure, secondary enclosure and

the pictures referenced, his Report clearly states that the fire originated inside the transformer

enclosure and spread uphill in a widening "vee."  This Order does not preclude Mr. Ford from so

testifying.

## CONCLUSION

Based on the foregoing, Edison's, motion to strike expert opinions is HEREBY

GRANTED in part.  The United States will not be permitted to offer at trial the additional

opinions rendered by Mr. Ford after his review of higher resolution copies of 1994 photographs

of the fire scene and consistent with this Order, the United States will be limited to Mr. Ford's

opinion as disclosed in his July 2004 report.  Edison's alternative motion to permit the filing of

supplemental/rebuttal expert reports is DENIED.

IT IS SO ORDERED.

**Dated:   May 24, 2005**                                   **/s/ Dennis L. Beck**
3b142a                                                              UNITED STATES MAGISTRATE JUDGE