1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

7

**EASTERN DISTRICT OF CALIFORNIA**

8

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>  v.<br><br>SOUTHERN CALIFORNIA EDISON<br>COMPANY,<br><br>            Defendant. | CIV-F-01-5167 OWW DLB<br><br>MEMORANDUM AND ORDER DENYING<br>PLAINTIFF'S CROSS MOTIONS FOR<br>PARTIAL SUMMARY JUDGMENT<br>(DOCS. 257) AND DENYING<br>DEFENDANT'S CROSS MOTIONS FOR<br>SUMMARY JUDGMENT (DOCS. 253). |

## I.  INTRODUCTION

This is an action for damages stemming from a fire allegedly ignited by electrical equipment operated by Defendant Southern California Edison Company ("Defendant" or "SCE") in Big Creek, California.  The fire caused damage to property belonging to the United States of America ("Plaintiff").  Plaintiff alleges that the fire ignited when a squirrel came into contact with a 12kV transformer located within an enclosure known as the 12kV substation.

The parties cross-move for partial summary judgment on the issue of whether the 12kV substation is covered by the Federal

**1**

Energy Regulatory Commission ("FERC") licenses held by SCE.   Even if the 12kV substation is not covered by the terms of the FERC licenses, the government moves in the alternative for partial summary judgment on the issue of whether SCE is nonetheless liable under the terms of the licenses.   Finally, if SCE is found not to be liable under the terms of the license, the government moves for partial summary judgment that SCE is liable in trespass regardless of fault.

The parties have each filed lengthy statements of undisputed fact and evidentiary objections thereto.   (*See* Docs. 275, 284 Attach. 1; 289; 291; 294; 297.)

## II.   <u>GENERAL BACKGROUND AND PROCEDURAL HISTORY</u>[1]

SCE operates a hydroelectric power generation facility in Big Creek, California, which is located on federal lands, inside the boundary of the Sierra National Forest.   On August 24, 1994, a fire ignited in the vicinity of Big Creek Powerhouses Nos. 2 and 2A.   (SCE Undisputed Fact ("SCE UF") #1, Doc. 298; Plaintiff's Undisputed Fact ("USA UF") #1, Doc. 297.)   The fire ("Big Creek fire") allegedly burned more than 5,000 acres of National Forest lands before it was extinguished.   (Second Amended Complaint ("Complaint"), ¶6.)   The fire apparently began

---

[1]   The procedural history of this case is set forth in greater detail in the August 10, 2004 Order Re: Request for Reconsideration of Magistrate Judge's Ruling.   (Doc. 99.)

when a squirrel came into contact with one of the 7.2/12kV

transformers located in a switchyard (the "12kV substation") near

Powerhouses Nos. 2 and 2A.  (SCE UF #3; USA UF #3.)

Both Powerhouse Nos. 2 and 2A are owned and operated by

Defendant under licenses from the Federal Energy Regulatory

Commission ("FERC").  (USA UF #8 & #14.)  The 12kV substation is

a fenced-in yard located approximately 400 feet from Powerhouses

Nos. 2 and 2A and contains various pieces of equipment, including

several 12kV transformers.  (*See* SCE UF #8.)  The 12kV

transformers located within the 12KV substation step up a 7,000

volt ("7kV") power source from Big Creek Powerhouse No. 2 to

12,000 volts ("12kV").  (SCE UF #10.)

The Complaint contains fifteen causes of action:  (1) breach

of the Project No. 2175 license, (2) indemnity under the Project

2175 license, (3) breach of Project No. 67 license, (4) indemnity

under the Project 67 license, (5) breach of Memorandum of

Understanding, (6) breach of Special Use Permit, (7) trespass to

federal lands, (8) trespass in violation of California Civil Code

§ 3346, (9) trespass by fire, (10) Trespass under California

Civil Code § 3334, (11) negligence per se for violation of Cal.

Pub. Res. Code § 4291, (12) liability under Cal. Health and

Safety Code §§ 13007 and 13008, (13) negligence based on Pub.

Util. Code § 451, (14) negligence, (15) recovery of interest,

penalties, and investigative, administrative and collection

**3**

costs.  (Doc. 172, filed Nov. 30, 2004.[2])

During the early stages of discovery, SCE responded to requests for admissions, admitting that the Project 2175 and 67 Licenses applied to the Transformer and 12kV substation.  (*See* Doc. 126, filed Sept. 21, 2004.)  After reviewing documents produced by the government in discovery, SCE moved to withdraw these admissions.  On October 22, 2004, the magistrate judge granted SCE's motion to withdraw admissions.  (Doc. 150, filed Oct. 22, 2004.)  The United States was given leave to amend its complaint and submit a plan for additional discovery.  (Doc. 150 at 8-9.)  During the hearing on the motion to withdraw, the magistrate judge suggested that the scheduling order in this case be amended to allow additional time for discovery.  The parties then moved to modify the scheduling order.  (Docs. 157, filed Oct. 27, 2004, and 158, filed Oct. 28, 2004.)

With the original summary judgment motion approaching (and the scheduling order not yet modified by the court), the parties filed motions for partial summary judgment.  (Doc. 139, filed Oct. 15, 2004; Doc. 159, filed Oct. 29, 2004; Doc. 176, filed Nov. 30, 2004.)  At the hearing on those motions, the parties

---

[2]   Plaintiff initially alleged that Defendant's hydroelectric plant is an ultrahazardous activity that should subject it to strict liability, and that Defendant should be liable for attorneys' fees under 13 U.S.C. §§ 13009, 13009.1 or 31 U.S.C. § 3717.  By order dated January 9, 2004, these claims were dismissed.  (*See* Doc. 42.)

**4**

agreed to postpone summary judgment proceedings to provide both sides additional time for discovery for all but one discrete legal issue:  Whether the United States is entitled to assert a claim for prejudgment interest on any recovery under the FERC licenses.  The district court granted summary judgment for the government on this issue, finding that such a claim may be pursued.  (*See* Doc. 205, filed Jan. 25, 2005.)

Following the hearing on the first round of summary judgment motions, a new scheduling order was entered.  (Doc. 211, filed Feb. 6, 2005.)  Among other deadlines, the revised scheduling order set April 5, 2005 as the deadline for "further disclosure of experts" and May 5, 2005 as the deadline for "supplemental expert disclosure."  (*Id*. at 2.)  The district court also stated that "either side may disclose any further experts by April 5th, and any rebuttal or supplemental experts to the new experts by May 5th."  On April 5, 2005, Edison designated Joel Prehiem and Geoffrey Rabone, both Edison employees, as expert witnesses.  The United States disclosed no expert on this date.  On May 5, 2005, the United States designated Kevin J. Mara and Cynthia A. Whelan as experts.  The United States later withdrew Ms. Whelan as an expert.  Mr. Mara's expert report was provided to SCE along with the May 5, 2005 disclosure.  On May 23, 2005, Edison moved to strike Mr. Mara's opinion.  (Doc. 230.)

In a decision filed July 13, 2005, the magistrate judge

found that the district court "did not intend to limit the May 5th designation to supplementation to an initial disclosure or rebuttal to other experts designated." (Doc. 250 at 5.)  In the alternative, even if the modified scheduling order only permitted the designation of rebuttal witnesses on May 5, 2005, the magistrate judge's July 12, 2005 order found that Mr. Mara's opinion was proper rebuttal testimony. (*Id.*)

SCE requested reconsideration of the magistrate judge's order. (Doc. 260, filed July 27, 2005.)  The district court, interpreting the language of its own order, found that Mr. Mara's opinion was not proper rebuttal testimony and struck his expert opinions. (Doc. 272, filed Sept. 23, 2005.)[3]

### III.   STANDARD OF REVIEW

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998). Therefore, to defeat a motion for summary judgment, the non-moving party must show (1) that a genuine factual issue exists and (2) that this factual issue is material. *Id.*  A genuine

---

[3]     The district court's order was issued after both parties had filed initial briefs on the pending motions for partial summary judgment, but before oppositions were filed.

**6**

issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party.   *See Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986).   The evidence must be viewed in a light most favorable to the nonmoving party. *Indiana Lumbermens Mut. Ins. Co. v. West Oregon Wood Products, Inc.*, 268 F.3d 639, 644 (9th Cir. 2001), *amended by* 2001 WL 1490998 (9th Cir. 2001).   Facts are "material" if they "might affect the outcome of the suit under the governing law." *Campbell*, 138 F.3d at 782 (quoting *Liberty Lobby, Inc.*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact.   *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).   If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial."   *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).   However, if the nonmoving party has the burden of proof at trial, the moving party must only show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).   Once the

**7**

moving party has met its burden of proof, the non-moving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *Triton Energy Corp.*, 68 F.3d at 1221.  The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. *Devereaux*, 263 F.3d at 1076.

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp.*, 477 U.S. at 322-23.

"In order to show that a genuine issue of material fact exists, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Rivera v. AMTRAK*, 331 F.3d 1074, 1078 (9th Cir. 2003) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 249).  If the moving party can meet his burden of production, the non-moving party "must produce evidence in response....[H]e cannot defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).  "Conclusory allegations

**8**

unsupported by factual data cannot defeat summary judgment."
*Rivera*, 331 F.3d at 1078.

The more implausible the claim or defense asserted by the
nonmoving party, the more persuasive its evidence must be to
avoid summary judgment. *See United States ex rel. Anderson v. N.
Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1996).  Nevertheless,
"[t]he evidence of the non-movant is to be believed, and all
justifiable inferences are to be drawn in its favor." *Liberty
Lobby, Inc.*, 477 U.S. at 255.  A court's role on summary judgment
is not to weigh evidence or resolve issues; rather, it is to find
genuine factual issues. *See Abdul-Jabbar v. G.M. Corp.*, 85 F.3d
407, 410 (9th Cir. 1996).

## IV.   SUMMARY OF THE PARTIES' MOTIONS

Several of the United States' claims for relief allege that
SCE breached certain terms and conditions of the FERC licenses
covering Project 67 and Project 2175.  The United States asserts
that SCE operates Big Creek Powerhouses No. 2 and 2A and
associated works, including the 12kV substation and the
transformers that allegedly sparked the fire, under these
licenses.  The licenses contain indemnification language that,
according to the United States, would require SCE to pay for
damage to the property of the United States caused by facilities
covered by the licenses.  SCE denies that the licenses apply to

**9**

the 12kV substation and/or the 12kV transformers and that, therefore, the indemnity provisions contained within the licenses do not govern any liability determination in this case.

The United States moves for summary judgment on the applicability of the license indemnification clauses to the damage caused by the Big Creek fire.  The United States first argues that the Project 67 and Project 2175 licenses explicitly apply to the 12kV transformer, pointing to various general provisions in the licenses and to one specific provision which, according to the United States, operates to explicitly incorporate the 12kV substation into the licenses.  SCE cross moves on this issue, asserting that the licenses do not explicitly cover the 12kV substation and/or the transformer.  SCE points to, among other things, lists of structures and equipment contained in the licenses, none of which mention the 12kV transformers or substation.  SCE also points to a map attached to the Project 2175 license which appears to indicate that a "substation" in the approximate location of the 12kV substation is "not part of the project."

As additional support for its argument that the 12kV transformers are not covered by the terms of the licenses, SCE argues that FERC cannot lawfully assert jurisdiction over the 12kV transformers.  Specifically, SCE maintinas that the transformers feed lines that serve retail customers and are

**10**

therefore part of the "interconnected distribution system" over
which FERC has no jurisdiction.  The United States objects to
SCE's characterization of the lines leaving the 12kV substation
and maintains that the 12kV transformers are in fact part of the
power generation system, not the distribution system, and
therefore properly fall <u>within</u> FERC's jurisdiction.  In the
alternative, even if the 12kV transformers do not technically
fall within FERC's jurisdiction, the United States maintains that
FERC has "mandatory jurisdiction" over the transformers by virtue
of the fact that the entire complex sits on federally reserved
lands.  The United States further argues that, even if there is
no basis for FERC to assert jurisdiction over the 12kV
transformers, the license provisions nevertheless render SCE
liable for the damage in this case.

Finally, in the event it is determined that the license
provisions do not apply in this case, the United States requests
summary judgment on several alternative legal theories.  First,
the United States submits that, if the licenses do not cover the
12kV substation or transformers, SCE was operating that equipment
unlawfully on government lands in violation of the Federal Power
Act and laws and regulations governing use the of National Forest
lands.[4]  Assuming SCE was operating the 12kV substation

_____

[4]   The United States does not offer a theory of liability
under these statutes and regulations.  It appears, instead, that
the United States simply desires summary adjudication as to

**11**

unlawfully on government land, the United States requests summary

judgment on the ground that SCE would therefore be liable in

trespass for the damage to the National Forest, regardless of the

extent to which SCE was at fault for the fire.  Second, the

United States requests summary judgment on the ground that SCE is

also liable, regardless of fault, under California Health and

Safety Code § 13007.

**V.  DISCUSSION**

    **A.**   **Cross Motions for Summary Judgment Concerning SCE's Liability under the Licenses**.

        **1.**   **Basic Regulatory Background.**

The Federal Power Act authorizes FERC to:

> issue licenses to...any corporation...for the purpose
> of constructing, operating, and maintaining dams, water
> conduits, reservoirs, power houses, transmission lines,
> or other <u>project works</u> necessary or convenient for the
> development and improvement of navigation and for the
> development, transmission, and utilization of power
> across, along, from, or in any of the streams or other
> bodies of water over which Congress has
> jurisdiction...or for the purpose of utilizing the
> surplus water or water power from any Government dam.

16 U.S.C. § 797(e)(emphasis added).  The Act defines a

hydroelectric "project" as a:

> complete unit of improvement or development, consisting
> of a power house, all water conduits, all dams and
> appurtenant works and structures (including navigation
> structures) which are a part of said unit, and all
> storage, diverting, or forebay reservoirs directly
> connected therewith, the primary line or lines

whether SCE has violated these provisions.

12

1
2
3
4
5
6

> transmitting power therefrom to the point of junction with the distribution system or with the interconnected primary transmission system, all miscellaneous structures used and useful in connection with said unit or any part thereof, and all water-rights, rights-of-way, ditches, dams, reservoirs, lands, or interest in lands the use and occupancy of which are necessary or appropriate in the maintenance and operation of such unit.

7   16 U.S.C. § 796(11).  "Project works" are defined as "the

8   physical structures of a project."  A facility must meet the

9   statutory definition of a "project work" to be licensed by FERC.

10  *New York Power Authority*, 98 FERC 61,033, 61,095 (2002)("The

11  Commission has jurisdiction over qualifying non-federal

12  hydroelectric project works, which are defined in Part I of the

13  Federal Power Act (FPA).  If a project work does not meet the

14  definition, it is not subject to the Commission's jurisdiction

15  

16  and therefore does not belong in the project license.").

17      The United States argues that the terms of the FERC licenses

18  may nevertheless apply to structures and equipment that are

19  appurtenant to project works, even if those appurtenant structures

20  and/or equipment are not themselves "project works."  There is some

21  support for this assertion.  In *Lake Ontario Land Dev. & Beach*

22  *Protection Ass'n v. F.P.C.*, 212 F.2d 227, 232 (D.C. Cir. 1945), the

23  D.C. Circuit noted:

24  

25  
> According to the statutory definitions, "project works" include all the physical structures of a project, and "project" includes not only named types of structures, such as dams, but also "all miscellaneous structures used and useful in connection with said unit."

26
27

28  But, this does not change the underlying rule that FERC's licensing

**13**

authority is limited to "project works," not entire "projects":

> The Commission licenses facilities-- dams, powerhouses, transmission lines, and other "project works" of various sorts--not projects as such. Care must be taken in any consideration of this statute lest an inadvertent shifting of the terms "project" (which is a whole development) and "project works" (which are structures) cause confusion.

*Lake Ontario,* 212 F.2d at 232.[5]   It appears to be well settled that under the definition of "project works," FERC's licensing authority ends at the "point of junction with the distribution system."   *See infra* at Part V.A.3.[6]   In other words, even if a

---

[5]     The United States advances a rule that is contrary to this warning from *Lake Ontario*, by suggesting that it may not be appropriate to sharply distinguish between "project works" and an entire "project."   In support of this assertion, the United States points to language from *SCE v. FERC*, 116 F.3d 507, 512 (D.C. Cir. 1997).   In that case, the D.C. Circuit examined a 1986 amendment to section 4(e) of the Federal Power Act, Pub. L. 99-495, which requires FERC to include certain additional environmental conditions in its licenses.   SCE argued in that case that section 4(e) should only apply to "original licenses" (those issued for projects that have yet to be built), not "new licenses" (those issued to existing projects whose licenses have expired).   SCE pointed out that section 4(e) made reference to the licensing of "project works" while section 15 (which provides general procedures for relicensing) referred only to "projects."   SCE argued that this "reflects the different types of licenses to which the two sections apply."   The D.C. Circuit rejected this argument on several grounds, while also noting that the "1986 amendment to the Power Act... seems to ignore the distinction between projects and project works, making us even more hesitant to place too much stress on this distinction."

Here, the United States points to this passage to support its assertion that FERC jurisdiction may extend beyond project works.   But, *SCE v. FERC* did not discuss the breadth of FERC's jurisdiction, nor suggest that FERC's jurisdiction should reach beyond "project works."

[6]     Exactly how the law defines the "point of junction" and the applicability of this jurisdictional rule to the facts of this case are in dispute  and are discussed at length at Part V.A.3.

**14**

particular structure or piece of equipment might under certain circumstances be considered appurtenant to a project work, if that structure or equipment is beyond the reach of FERC's jurisdiction, FERC cannot license it.

In certain circumstances, FERC may assert a form of jurisdiction over facilities that do not meet the statutory definition.  For example, FERC may review and then may grant an application to delete a facility that <u>was at one time</u> approved for licensing <u>but no longer meets</u> the statutory definition.  *See Great N. Paper, Inc.*, 97 F.E.R.C. 61,204, 61,893 (2001)("The only way the Commission has jurisdiction over the reservoirs at issue is if they are project works of the downstream unit of hydroelectric development. They no longer are. Nor were they ever under license, which means that the Commission cannot exercise the kind of authority it may exercise with respect to the transition of a work or facility from licensed status to non-licensed status.").  It may be inferred from this rule that FERC may assert jurisdiction over the previously licensed equipment or structure until the agency has acted upon an application to remove the equipment from the license.

Two fundamental questions are presented here: (1) Are the transformers explicitly included in one of the licenses, and therefore are covered equipment until FERC approves an application to remove them from the license?  (2) Assuming the

**15**

answer to this first question is no, does FERC have jurisdiction to regulate the 12kV transformer that was the origin of the Big Creek fire?

### 2.   Is the 12kV Substation Explicitly Covered by the Licenses?

If a piece of equipment <u>was at one time</u> approved for licensing, FERC may entertain an application to have the equipment removed from the license's coverage.  *See Great N. Paper, Inc.*, 97 F.E.R.C. at 61,893.  If the licenses explicitly covered the 12kV transformers, it may be inferred from *Great Northern Paper*, that the terms of the licenses apply to the 12kV transformers unless and until FERC removes them from the license's coverage.  It is not disputed that prior to the Big Creek fire, SCE had not applied to have the 12kV transformers removed.  It is hotly disputed, however, whether the licenses make any explicit references to the 12kV transformer, or other items the licensing of which would render the transformers licensable.

The language of the licenses was briefed extensively in the last round of summary judgment motions.  (Docs. 139, 159 & 176.) The parties reassert many of these arguments in the pending motions by exhaustively listing all the portions of the licenses that could arguably refer to the 12kV substation.  For example, on the one hand, the government points to passages containing

**16**

general language, such as a section of the Project 67 License

which states that the license applies to "all lands...

constituting the project area and enclosed by the project

boundary." (Project 67 License at 13; USA UF #5, 6, 10, 11.)[7]

In contrast, SCE points to lists of equipment contained in the

licenses, none of which make any mention of the 12kV substation

or any transformer that steps up 7.2kV power to 12kV. (SCE UF

#42-58.)[8]

     The parties advance three central arguments based on the

text of the licenses. First, the United States emphasizes a

reference in the Project 67 license to "small ancillary lines"

and insists that this references lines that currently extend from

---

[7]     Both licenses state that, "[t]he entire project, as
described in the order of the Commission, shall be subject to all
the provisions, terms, and conditions of the license." (Project
67 License, Form L-1, Art. 1; Project 2175 License, Form L-5,
Art. 1.)  In addition, a list of project works contained in the
Project 67 license, includes "[a]ll structures, fixtures,
equipment, facilities, or property which may be employed in
connection with the project whether located on or off the project
area, as approved by the Commission, and all riparian or other
rights necessary or appropriate for the maintenance or operation
of the project." (Project 67 License at 19 (emphasis added).)
The government argues that the use of the term "project" rather
than "project works" was intentional and, therefore, that the
License should be applied to the entire "project," not just those
features listed as "project works."

[8]     For example, License 67 explains that the "principal
features" of the project are "two powerhouses with a total
installed capacity of 154,000 kW; a switchyard; and two 220-kV
transmission lines linking the two project powerhouses to a
central system switchyard." (Kimball Decl. ¶5, Ex. A at 2.) The
12kV substation is not mentioned.

the 12kV substation.   Second, SCE points to a map that purportedly excludes the 12kV substation from Project 67. Finally, the United States notes that the 12kV substation is referenced in the application materials SCE submitted to FERC when it sought initial approval for Project 2175.

### a.   "Small ancillary lines."

The Project 67 license provides:

Transmission Facilities

> Two 220-kV, 3-phase, single circuit transmission lines emanate from the switchyard at Powerhouse No. 8. One is the intertie between Powerhouse No. 2A and No. 8; the other carries project power to the central switchyard at Powerhouse No. 3 (FERC Project No. 120), where it enters Applicant's interconnected primary transmission system. In addition, small ancillary power lines extend from Powerhouse No. 2A to Shaver Lake and to the top of the Powerhouse No. 8 penstocks. We find that these transmission facilities constitute part of the project as defined in Section 3(11) of the Act.

(Project 67 License at 4; Kimball Dec. at Ex. A (emphasis added).)   The parties dispute whether the phrase "small ancillary power lines" is intended to be a reference to any of the lines currently emanating from the 12kV substation (the Snocat, Manzanita, and Stevenson).

The United States asserts that a portion of the Stevenson line, which currently emanates from the 12kV substation, currently supplies power to the penstocks of Powerhouse 8.   (USA UF #15.)   In addition, a portion the Sno-Cat line "was at one point the primary power supply to Shaver Lake Dam and still

**18**

supplies power to Shaver Lake Dam." (USA UF #17.)  There are

certainly similarities between the "small ancillary lines"

described in the Project 67 license and these characteristics of

the Stevenson and Sno-Cat lines.

SCE insists, however, that Plaintiff's evidence is suspect

and disputed.  For the most part, the United States relied on the

expert opinions of Mr. Mara to support the undisputed nature of

these facts.  SCE correctly points out that Mr. Mara's opinions

have been stricken by the court.  The United States argues that

these facts are present in other portions of the record.  For

example, the government points to deposition testimony given by

SCE's expert, Mr. Preheim, who stated that the Stevenson line

supplies "backup power" to the penstocks of powerhouse 8, as well

as to powerhouse 8. (Ex. 16, at 89:8-90:8.)  Preheim also

admitted that, if the power were to go out at Powerhouse 8, SCE

would provide power to run the penstocks through the Stevenson

line. (Ex. 16, at 92:1-9.)

SCE, however, presents a declaration from Mr. Preheim

submitted with SCE's opposition to the government's motion for

summary judgment.  In that declaration, Mr. Preheim clarifies

that he actually believes that the reference to "small ancillary

power lines" in the Project No. 67 license is "confusing because

it does not accurately describe any power lines associated with

[] Powerhouse No. 2A as currently configured." (Preheim Opp'n

**19**

Decl., at ¶9.)   Mr. Preheim further declares that he has determined that "the lines referred to were the Musick line which emanates from [] Powerhouse No. 2 and goes toward Shaver Lake and the Jumbo line which runs from Big Creek Powerhouse No. 8 to the top of the Powerhouse No. 8 penstocks."   (*Id*. at ¶8-9.)

Rather than responding to SCE's objections with facts, the United States protests that SCE should not be permitted to create a dispute of fact by submitting a declaration from Mr. Preheim contradicting his deposition testimony.   In support of this proposition, the United States cites *School District No. 1J, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1264 (9th Cir. 1993), which makes reference to cases, including *Foster v. Arcata Assoc., Inc.*, 772 F.2d 1453, 1462 (9th Cir. 1985) and *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540,544 (9th Cir. 1975), where the Ninth Circuit held that a party should not be able to substitute an affidavit alleging helpful facts, which contradict earlier deposition testimony harmful to its case in order to avoid summary judgment.   However, the Ninth Circuit warns that the *Foster-Radobenko* rule "should be applied with caution." *Multnomah*, 5 F.3d at 1264.

> [T]he Foster-Radobenko rule does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony.   The district court must make a finding of fact that the affidavit was a "sham."

*Id*. (internal citations and quotations omitted).   Here, there is

**20**

nothing in the record which indicates that Mr. Preheim's second affidavit is a "sham," which means baseless or frivolous.   The declaration appears to be a good faith effort on the part of SCE to clarify Mr. Preheim's otherwise confusing and ambiguous deposition testimony.

In the final analysis, the evidence concerning the meaning and identification of the "small ancillary lines" mentioned in Project 67 is disputed.   Neither party is entitled to summary adjudication on this issue.

> **b.   Project 67 map indicating that the 12kV substation is "not a part of this project."**

SCE cross-moves on the issue of whether the licenses explicitly cover the 12kV Substation/transformers.   In support of this contention, SCE relies heavily on Exhibit K-5 attached to License 67, which is a map described as showing the "Project Area in the Vicinity of Big Creek Powerhouse No. 2A."   It is not disputed that this map identifies the 12KV Substation as "Not Part Of This Project."   (SCE UF #46.)

The United States insists that the Project 67 map only excludes the 12kV substation because the 12kV substation is a project work under the Project 2175 license.   (USA's response to SCE UF #46.)   The government also points out that

> Powerhouse 2, which is a project work of project 2175 (but not project 67), is also shown on Exhibit K-5 with a dashed outline.   In contrast, FERC Exhibit K-6 to the project 2175 license depicts the 12kV substation in the same location but with a <u>solid line</u>, as it does for

**21**

powerhouse 2 and the other project works licensed under
project 2175. Powerhouse 2A, which is a project work of
project 67 (but not project 2175), is shown with a
dashed outline.

(*Id.* (emphasis added and citations omitted).)   Taken together,
these two maps, Exhibit K-5 to the Project 67 license and Exhibit
K-6 to the Project 2175 license, create a dispute as to a
material fact:  whether the 12kV substation is a part of Project
67, Project 2175, or neither.   Summary adjudication as to the
explicit exclusion or inclusion of the substation in the license
is therefore not warranted on this ground.

> ### c.   The United States' arguments regarding references to the 12kV substation in license applications filed by SCE.

The United States continues to point to numerous references
to the 12kV substation in SCE's application for the licenses.
(*See, e.g.*, USA UF 9, 12A-12C.)   Any arguments based on the
mention of the 12kV transformer in the license applications are
not well founded.   Even assuming, arguendo, that the 12kV
transformer is included in the license, only FERC may determine
whether a particular piece of equipment is a project work and is
licensable.   *See also Dept. of Water Resources*, 51 F.P.C. at 533
("The mere fact that various facilities are proposed for
licensing by an applicant is not sufficient reason to assume that
all of such facilities are properly the subject of a license.").

Neither party is entitled to summary judgment based on the

**22**

face of the licenses.  The government has failed to establish
that the licenses explicitly include the 12kV transformers and
SCE has failed to establish that the licenses affirmatively
exclude the transformers.  This issue remains for trial.

As a matter of contract law, the license terms are
ambiguous.  Beyond the above-discussed arguments concerning the
plain language of the licenses, however, both parties place great
emphasis upon the breadth and scope of FERC's jurisdiction.
Although neither party supports their jurisdictional arguments
with an over-arching legal theory, the extent of FERC's
jurisdictional reach is relevant to the interpretation of the
ambiguous licenses.  SCE impliedly asserts that ambiguity in the
licenses should be construed in SCE's favor because FERC cannot
lawfully assert jurisdiction over the 12kV transformers.  In
contrast, by insisting that FERC's jurisdictional reach <u>includes</u>
the 12kV transformers, the United States impliedly argues that
the ambiguous license should be construed in its favor.

### 3.  <u>Does FERC have jurisdiction to regulate the 12kV transformer(s)</u>?

One of the primary disputes raised by these motions is
whether FERC has jurisdiction to regulate the 12kV transformers.[9]
This question breaks down into two separate inquiries.  The first

---

[9]    Whether the licenses nevertheless provide indemnity to
the United States against damages caused by this fire, a related
but distinct question, is discussed *infra* at Part V.B.2.

**23**

inquiry is a legal one:  Under what circumstances, if any, does FERC have jurisdiction over transformers that step up hydro-generated power for ultimate distribution to retail customers? The second inquiry is factual: Do the 12kV transformers qualify as the type of equipment over which FERC has jurisdiction?

A review of the record and relevant caselaw suggests that neither party is entitled to summary judgment on the issue of whether the 12kV transformers fall within FERC's jurisdiction.

### a.   Applicable Law:  What is the reach of FERC's jurisdiction?

The starting point for this jurisdictional inquiry is the agency's enabling statute.  The Federal Power Act authorizes FERC to:

> issue licenses to...any corporation...for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction...or for the purpose of utilizing the surplus water or water power from any Government dam.

16 U.S.C. § 797(e)(emphasis added).

As discussed, FERC's licensing jurisdiction is limited by the statutory definition of "project":

> "[P]roject" means complete unit of improvement or development, consisting of a power house, all water conduits, all dams and appurtenant works and structures (including navigation structures) which are a part of said unit, and all storage, diverting, or forebay

**24**

> reservoirs directly connected therewith, *the primary line or lines transmitting power therefrom to the point of junction with the distribution system or with the interconnected primary transmission system*, all miscellaneous structures used and useful in connection with said unit or any part thereof, and all water-rights, rights-of-way, ditches, dams, reservoirs, lands, or interest in lands the use and occupancy of which are necessary or appropriate in the maintenance and operation of such unit;

16 U.S.C.A. § 796 (emphasis added); *see also Montana Power Co. v. FPC*, 112 F.2d 371, 373 (9th Cir. 1940).  The point of demarcation between licensable and unlicensable equipment is the "point of junction with the distribution system or with the interconnected primary transmission system."  Critically, a **"primary line,"** falls under FERC's jurisdiction, while a line that is part of the **"primary transmission system,"** is beyond FERC's jurisdiction.

Here, the issue is whether the 12kV transformer that allegedly ignited the Big Creek fire lies on the licensable or the unlicensable side of this jurisdictional demarcation.  It is not disputed that several lines (specifically, the Snocat, Manzanita, and Stevenson lines) emanate from the 12kV substation. It is disputed, however, whether any of the these three lines are part of the "distribution system or..the interconnected primary transmission system."  Even if this initial question is answered in the affirmative, it is also disputed whether the 12kV transformer is the "point of junction."

//

**25**

### (1) "Primary line" v. "primary transmission system."

To determine whether a line is a "primary line" or is part of the "primary transmission system":

> the test to be applied is that of the **basic purpose** of the line in relation to other facilities. In determining which of the many purposes of any given line is the basic purpose we must, therefore, look to the specific facts before us.

*Re: Western Mass.* Elec. Co., 39 F.P.C. 723, 731 (1968) FERC defines a "primary line" as follows:

> If a line is used solely to transmit power from a Commission-licensed project to a load center, and if without it there would be no way to market the full capacity of the project, then that line is primary to the project.  However, if a line serves both the project and a distribution system or interconnected transmission system, it is not a primary line.

*Puget Sound Hydro*, 109 F.E.R.C. 61,039 at *8 (2004); *see also Georgia Power Co.*, 39 F.P.C. 930, 931-32 (1968)(a facility cannot serve as both a primary line, over which FERC has jurisdiction, and a distribution system, over which FERC has no jurisdiction).

### (2) "Point of junction."

FERC has repeatedly held that its jurisdiction ends at the "point of junction" with the primary distribution system.  To properly apply this rule, two legal questions must be answered: (1) Under a particular equipment configuration, which piece of equipment is the "point of junction" with the distribution system?  (2) Once this "point of junction" is identified, does

**26**

FERC jurisdiction include or exclude the particular piece of equipment that is so identified?

A number of cases shed light on how a court should determine the "point of junction" with the primary transmission system. In *Montana Power Company v. FPC*, 56 F.P.C. 3290 (1976), the FPC considered whether its jurisdiction extended to several power lines emanating from a switchyard. A number of lines connected to a 100kV bus (which is essentially a switching station containing lines and switches that all operate at 100kV) within a switchyard. Two 100kV lines (the Kerr-Thompson Falls A and B lines) connected <u>directly</u> to the 100 kV bus. For various reasons that were specific to the facts of the *Montana* case, the FPC found that these 100kV lines were distribution lines (i.e., they were not primary lines subject to FPC jurisdiction). Two other lines connected to the 100kV bus, each through a 100/161 kV transformer. These lines carried power at 161kV away from the switchyard. Again, for reasons specific to the *Montana* case, the FPC found that these 161kV lines were also distribution lines (i.e., <u>not</u> primary lines). In contrast, however, a fifth line connected a 13.2 kV hydropower plant to the 100kV bus through a 13.2/100 kV transformer. The FPC found that this line, <u>including the 13.2/100kV transformer</u>, and the 100 kV line leading from the transformer to the 100kV bus <u>were</u> primary lines, and therefore should be included in the license. The FPC found, however, that

the 100kV bus was "common to both distribution lines and the interconnected transmission system" and that the FPC's jurisdiction was "limited to that point of interconnection."

*Montana* did not explicitly define what it meant by finding that its jurisdiction is "limited to" that point of interconnection. In other words, FPC did not explicitly address whether its jurisdiction included or excluded this point of interconnection (the 100kV bus). It can be inferred from the case, however, that its jurisdiction <u>excluded</u> this point of interconnection because in the *Montana* opinion the FPC listed all those pieces of equipment that should be included in the license and the 100kV bus was <u>not included</u> in this list.

Each side relies on *Montana* to support its position. SCE emphasizes that the FPC <u>excluded</u> the 100kV bus as well as the 100/161 kV transformers feeding two of the distribution lines from the license. The United States emphasizes that the FPC <u>included</u> the 13.2/100 kV transformer that stepped up power from the Kerr plant and fed it into the 100kV bus.

*Lockhart Power Co.*, 11 FERC 61,287, 61585 (1980) provides additional guidance. In *Lockhart*, FERC found that a transformer within a substation was the point of junction with the distribution system and excluded from the license, while three other transformers were found to be part of the "facilities associated with the primary lines." Lockhart concerned two

independent sets of equipment.  First, a single transformer

converted power from a 2.3kV generation source to 33kV, which was

then sent on to a distribution substation.  Second, a separate

bank of three transformers also converted power from a 2.3kV

generation source to 33kV.  All three transformers then fed power

at 33kV into a 33kV "bus."  The bus, in turn then fed power to

several distribution substations and a switching station

    The applicable factual description in *Lockhart* provides some

additional information:

> The project substation contains four 2.3/33 -kV
> transformers, Nos. 1, 2, 3 and 4. On its 2.3-kV
> side--the generator lead side--transformer No. 1
> constitutes the point of junction with Lockhart's
> distribution system serving the Lockhart Village
> distribution substation. Since transformer No. 1 serves
> as a "point of junction with the distribution system"
> within the meaning of Section 3(11) of the Act, it is
> not part of the project and will be excluded from the
> license. Transformers Nos. 2, 3 and 4, on the other
> hand, are part of the project within the meaning of
> Section 3(11). Power flows from the hydroelectric
> generators at the project through these transformers to
> the 33-kV bus on their high voltage side. The 33-kV bus
> is the point of junction with the 33-kV lines to the
> Adamsburg and Lockhart Mill distribution substations
> and the Monarch switching station. Thus, these three
> transformers are part of the facilities associated with
> the primary lines (the generator leads) through which
> project power flows before reaching the point of
> junction with the interconnected primary transmission
> system. Ordering paragraph (B)(2)(g) of the order
> issuing the license for Project No. 2620 is also being
> amended consistent with these findings.

11 FERC at 61585.

    The United States focuses on the second part of FERC's

reasoning, concerning transformers 2, 3, and 4:

> Transformers Nos. 2, 3 and 4...are part of the project
> within the meaning of Section 3(11). Power flows from
> the hydroelectric generators at the project through
> these transformers to the 33-kV bus on their high
> voltage side. <u>The 33-kV bus is the point of junction
> with the 33-kV lines</u> to the Adamsburg and Lockhart Mill
> distribution substations and the Monarch switching
> station. Thus, these three transformers are part of the
> facilities associated with the primary lines (the
> generator leads) through which project power flows
> before reaching the point of junction with the
> interconnected primary transmission system. Ordering
> paragraph (B)(2)(g) of the order issuing the license
> for Project No. 2620 is also being amended consistent
> with these findings.

*Id*. (emphasis added).  From this description it can be inferred

that where a transformer (or a bank of transformers) steps up

power from a lower-voltage generation source to a distribution

voltage and then feeds this stepped-up power into a bus operating

at the distribution voltage, the <u>bus</u> is considered the point of

junction with the distribution system, not part of the primary

line, but the transformers which feed the bus are considered part

of the primary line and are licensable.

SCE, for obvious reasons, focuses on the holding concerning

transformer No. 1:

> On its 2.3 kV side--the generator lead side--
> transformer No. 1 constitutes the point of junction
> with Lockhart's distribution system serving the
> Lockhart Village distribution substation. Since
> transformer No. 1 serves as a "point of junction with
> the distribution system" within the meaning of Section
> 3(11) of the Act, it is not part of the project and
> will be excluded from the license.

*Id*.  SCE emphasizes that it is the low voltage side (i.e., before

the power is stepped up to the distribution voltage) that is

considered the point of junction with the distribution system.

1   It is not clear whether Lockart's transformer No. 1 was connected

2   to the distribution system through a bus or similar piece of

3   intermediary equipment, but it is safe to infer that there was

4   some structural distinction between transformer No. 1 and the

5   other three transformers.  This description is of limited

6   precedential value, however, because it is so lacking in

7   detail.[10]

8

9

10  _____

      [10]     SCE also points to *Puget Sound Hydro*, 109 F.E.R.C.
11  61,039.  In that case, FERC determined that it lacked
    jurisdiction over an entire hydro-power project because the
12  project generated energy from a non-navigable waterway.  However,
    one line emanating from the project passed over federal land.
13  Even if a project is not located on a navigable water way (a
    basis for Congressional action under the Commerce Claus) location
14  of a project on federal land (a basis for Congressional action
    under the Property Clause) is an alternative basis for FERC
15  jurisdiction.  16 U.S.C. § 797.  FERC reasoned that if the line
    extending over federal land was a "primary line," the agency
16  would possess licensing jurisdiction over the entire project.
    FERC then examined the electrical relationship between this line
17  and the rest of the project.  From a physical perspective, the
    line in question left the project's generation plant, passed
18  through a substation, and then continued via a 55kV line, which
    crossed over federal property.  At the substation, power was
19  stepped down via transformers which fed two secondary lines.
    The transformer stepped power down from 55kV to 2300 volts to
20  "supply station service to Puget Hydro."  The second transformer
    stepped power down to 220 volts for distribution to a retail
21  service meter located 500 feet from the substation on project
    land (i.e., not on federal land).  FERC held that the substation
22  was the "point of junction with the interconnected primary
    transmission system."  FERC also found that the "primary
23  transmission line end[ed] at the PSE substation" which was not on
    project land.  In other words, once the 55kV line passed through
24  the substation, it was no longer a primary line.  Therefore, even
    though the 55kV line crossed federal land, it was not a
25  licensable line at that point.  Accordingly, because no part of
    the project was located on federal land, the project was not
26  licensable.  What is not clear from the *Puget Sound* case is
    which, if any, pieces of equipment in the substation were
27  considered licensable by FERC.  *Puget Sound* is not particularly
    helpful to this case.
28

The United States also points to *Consumers Power Co.*, 5
FERC, 61,141, 61,336 (1978), in which FERC confronted the
following factual situation.

> [A] 7.5kV line runs from the power plant bus to
> 7.2-kV/14.4-kV step-up transformers in the new 14.4-kV
> [ ]substation. From there, a 14.4-kV tap line runs to
> two 14.4-kV distribution lines.

*Id.* The licensee argued that the 7.2kV/14.4kv step-up
transformers were part of the distribution system and should be
excluded from the license. *Id.* FERC rejected this argument,
finding instead that

> The "point of junction" with the Licensee's
> distribution system is clearly the point where its
> 14.4kV distribution lines begin -- after project power
> has been stepped-up to the distribution voltage.
> Accordingly, the 7.2 kV line from the power plant bus
> to the 14.4 kV substation and the bank of 7.2 kV/14.4
> kV step up transformers constitute project lines and
> appurtenances.

*Id.* This holding appears to conflict with the portions of
*Lockhart* cited by SCE, where FERC found that the low-voltage (or
the "generator lead") side of a step-up transformer was the
"point of junction" and therefore that the entire transformer was
unlicensable. For example, in *Consumers Power*, a "tap line" is
situated between the transformers and the distribution lines. If
this "tap line" is electrically similar to a "bus," then
Consumers Power more closely parallels the factual situation in
*Montana* and the holdings from *Lockhart* cited by the United
States. Interpretation of such a similarity from the available

**32**

information requires analysis by an expert witness.  No such evidence has been provided.[11]

A few general rules can be elicited from the caselaw, even without expert testimony; despite inconsistencies between *Montana, Lockhart* and *Consumers Power*.

(1)    First, whether a <u>line</u> is a primary line or is part of the primary transmission is determined by examining the basic purpose served by that line.

(2)    Second, once it has been identified that at least one line leaving a substation is part of the primary transmission system, a court must closely examine the relationship between the elements of that substation (from an electrical engineering perspective) to

---

[11]    The United States points to *Georgia Power Co.*, 39 F.P.C. 930, 934 (1968).  In that case, FERC was called upon to determine whether several lines were licensable primary lines. After analyzing the uses to which those lines were put, FERC made determinations as to each line.  Several lines were found to be part of the interconnected transmission system and therefore were not included in the license.  However, "each line or cable transmitting power from the hydro generating equipment...to the first point of junction with the Applicant's distribution system or interconnected primary transmission system...." were licensable primary lines.  *Id.* at 933.  In its final order concerning the license, FERC stated that the licenses should include these lower voltage lines leading away from the generation facilities, the transformers that stepped up power to the transmission voltage, and associated switching facilities. Once again, perhaps because FERC was focused on the classification of the lines, rather than the transformers, this case lacks the kind of detailed description of the electrical relationship between the transformers and the interconnected distribution system.

determine which pieces of equipment are licensable and which are not.

(3)   Third, based on those cases which specifically describe the interconnections between the primary lines and the primary transmission system, a set of rules can be inferred.

(a)   If one or more lines that are part of the primary transmission system feed off of a bus, that bus is the point of interconnection and is not licensable.

(b)   If a primary line feeds into the bus through a transformer, that transformer is considered part of the primary line and is licensable.

(c)   However, under certain situations, if a primary line feeds directly into a transformer which, in turn, feeds directly into the primary distribution system (i.e., without an intervening bus), the transformer should be considered the point of junction with the distribution system and is _not_ licensable.

These "rules" are derived by interpretation of administrative caselaw many decades old.  Federal district court judges do not, in general, possess expertise in electrical

**34**

engineering, nor in the field of hydro-power licensing.  What is clear from the case law is only this: there are no definitive criteria by which to determine if a step-up transformer is licensable as a project work.  At the least, where a transformer steps up low voltage power from a generation source and feeds that power into a bus, which in turn feeds distribution lines, the transformer is part of a primary line and therefore falls within FERC's jurisdiction.  The question is whether this rule governs the 12kV transformer that allegedly sparked the Big Creek fire.

In the context of the pending cross-motions, the inquiry is whether there is undisputed evidence to permit application of this rule as a matter of law.  For example, can the United States establish that the lines emanating from the 12kV substation are in fact primary lines, contrary to SCE's submission that they are for distribution to retail customers?  Alternatively, can the United States establish that the 12kV transformers feed into a bus, and therefore that the bus, not the transformers, is the point of interconnection?  In either case, the United States might be entitled to summary adjudication on the issue of whether FERC would have had jurisdiction over the transformers.

//

//

**35**

1

2

### 4.   Is the 12kV transformer that allegedly sparked the Big Creek fire subject to FERC jurisdiciton?

3

4     SCE asserts that one or more of the lines emanating from the

5 12kV substation distribute power to retail customers and are part

6 of the interconnected distribution system.  SCE also asserts that

7 the bank of 12kV transformers in the substation (including the

8 disputed 12kV transformer) is the point of junction with the

9 distribution system.  The United States rejoins that none of the

10 three lines currently emanating from the 12kV substation are

11 distribution lines.  Therefore, according to the United States,

12 all of the equipment in the substation is licensable.  In the

13 alternative, even if any or all of the three lines are part of

14 the distribution system, the United States asserts that the point

15 of interconnection is actually a 12kV bus situated between the

16 12kV transformers and the three emanating lines.  If this is the

17 case, the 12kV transformers sit on the licensable side of the

18 jurisdictional line.

19

20

### a.   Are any of the three lines emanating from the 12kV substation distribution lines?

21

22     It is not disputed that three power lines currently emanate

23

24 from the 12kV substation:  Snocat, Stevenson, and Manzanita.

25 SCE, primarily through the declaration of Joel Preheim, focuses

26 on establishing that at least one of three lines emanating from

27 the 12kV substation is a distribution line.  The United States

28 objects to SCE's evidence and points to several facts that

suggest these lines should instead be considered primary lines.[12]

SCE maintains that "the Manzanita line formerly served as a local distribution line to company-owned housing which was built from the 1910s through the 1930s in the area surrounding Big Creek Powerhouse Nos. 2 and 2A." (SCE UF #18; Preheim Dec. ¶6) Mr. Preheim, who lived in one of the cottages in the SCE housing area during the 1980s, maintains that the cottages "were equipped with meters to measure electrical power consumption for billing purposes" no later than the 1930s. (SCE UF ## 19-23; Preheim Dec. ¶6.)

According to SCE, the Snocat line formerly distributed electricity to more than 75 percent of the light commercial and residential customers in and around the town of Shaver Lake. (SCE UF #24; Preheim Dec. ¶7.)  Preheim estimates that Shaver Lake first got electrical service from SCE on the Snocat line no later than 1940 and possibly in the 1930s. (SCE UF #25; Preheim Dec. ¶7; Kimball Dec., Ex. H.)  The Snocat line also supplied power to SCE facilities at Shaver Lake, such as Shaver Dam and certain SCE operated recreational facilities. (SCE UF #26;

---

[12]    As discussed above in Part V.A.2.a, the government also maintains that these three lines are referenced in the Project 67 license, which refers to several "small ancillary power lines [that] extend from Powerhouse No. 2A to Shaver Lake and to the top of the Powerhouse No. 8 penstocks."  SCE has demonstrated that there is a dispute over material facts relevant to this assertion.  As a result, for the purposes of this motion, it is disputed if the "small ancillary lines" language refers to either the Snocat, Stevenson, or Manzanita lines.

Preheim Dec. ¶7.)  In the 1980s and 1990s, the use of the Snocat line changed, during which time it provided about 40 percent of the customer service to Shaver Lake and served as a backup distribution source.  (SCE UF #27; Preheim Dec. ¶ 7.)  Currently, the Snocat line "continues to serve as primary power to Forest Service facilities and the Ponderosa Telephone Company at Musick Mountain near Shaver Lake and as a backup source for Shaver Lake's customer load."  (SCE UF #28; Preheim Dec. ¶7.)

With respect to the Stevenson line, SCE maintains that it "provides a distribution system along Big Creek, serving residential and light commercial customers and providing backup power to certain SCE facilities."  (SCE UF #30; Preheim Dec. ¶8.) Retail customers on the Stevenson line include Hogue Ranch, the United States Forest Service's Clear Water Forest Station, and Wagner's Mammoth Pool Resort, a retail store, restaurant and campground at Mammoth Pool Reservoir.  (SCE UF #32; Preheim Dec. ¶ 8; Wagner ¶¶ 2-5.)  SCE maintains that the Stevenson line has served the Mammoth Pool Resort since 1958 and its operators have paid monthly bills to SCE since June 1, 1958.  (SCE UF #33; Declaration of Nelda Wagner ¶¶ 2-5; Preheim Dec. ¶ 8.)  It is undisputed that the Stevenson line also supplies backup power to several Big Creek powerhouses operated by the Hydro Division of SCE.  (SCE UF #37; Preheim Dec. ¶ 9.)  However, backup power is not continuously supplied to SCE powerhouses via the Stevenson Line.  Rather, power from Stevenson may be called upon if any of

38

these facilities become disconnected from their primary power source.  (SCE UF #38; Preheim Dec. ¶9.)

The United States challenges almost every "undisputed fact" proffered by SCE.  The evidentiary dispute surrounds the evidence presented by SCE's expert Joel Preheim, who speaks most directly to the purpose of the power lines emanating from the 12kV substation.  In support of his expert opinions Mr. Preheim relies upon some evidence he has observed first-hand and some evidence he apparently gathered from the historical record and, perhaps, from other SCE employees.

The government objects generally to the admission of Mr. Preheim's opinions on the ground that he bases his opinions on evidence about which he has no personal knowledge.  But, it is perfectly permissible for an expert witness to base his or her opinions on the synthesis of second-hand information which may or may not be part of the record or even admissible:

> Rules 702 and 704 allow properly qualified experts to testify in the form of an opinion about issues as to which their expertise may assist the trier of fact, even if the opinion embraces an ultimate issue of fact. Rule 703 permits the expert to base opinions or inferences on facts or data not admissible in evidence if they are of a type reasonably relied upon by experts in the field. Rule 705 permits an expert to give opinion testimony without prior disclosure of the underlying facts or data.

*Bieghler v. Kleppe*, 633 F.2d 531, 533 (9th Cir. 1980).

The United States also objects on the ground that Mr.

Preheim's deposition testimony conflicts with the facts set forth in his declarations, upon which SCE relies upon to support its statement of undisputed facts.  In general, the government's objections are grounded in government counsel's effective cross-examination of Mr. Preheim at his deposition on the accuracy of the <u>dates</u> provided in his declarations.  Mr. Preheim repeatedly backed away from specific dates.  (*See* USA's Objections to SCE's Evidence, Doc.  284, Attch. 1, at 13-19.)  Mr. Preheim's deposition testimony does raise disputes as to the accuracy of specific dates included in his declarations.

The dates are material because of a rule set forth in *Great Northern Paper*.  97 F.E.R.C. at 61,893 ("The only way the Commission has jurisdiction over the reservoirs at issue is if they are project works of the downstream unit of hydroelectric development.  They no longer are.  Nor were they ever under license, which means that the Commission cannot exercise the kind of authority it may exercise with respect to the transition of a work or facility from licensed status to non-licensed status.").  This case suggests that, if a piece of equipment was once covered by a license, FERC must approve an application to delete that equipment from the license before it loses jurisdiction over the piece of equipment.

It is undisputed that the 12KV Substation was initially built in 1926 to supply power for construction of other

**40**

powerhouses, such as Big Creek Nos. 3 and 8.  (SCE UF #15; Preheim Dec. ¶ 10.)  It also cannot be disputed that the 12kV substation (and the transformers within it) would have been licensable at this initial stage.  However, it is SCE's contention that the use/purpose of at least some of the lines emanating from the substation changed over time.  As explained above, SCE maintains that <u>now</u> at least some of the lines serve retail customers.  But, even accepting SCE's classification of the <u>current</u> use of the lines, it is important to know <u>exactly when</u> these changes were made vis-a-vis the issuance of the most recent FERC licenses in 1959 (for the Project 2175 license) and 1978 (for the Project 67 license).

If the licenses were issued **BEFORE** the change in the use of the lines, then the *Great Northern Paper* rule suggests that SCE should have applied for those lines to be **REMOVED** from the license.  It is not disputed that SCE never applied for removal and, accordingly, that FERC never granted such an application or removed the transformers sua sponte or by operation of law.

The United States has pointed to record evidence raising a dispute as to the dates provided by Mr. Preheim.  The quesiton then becomes: Has either party presented any additional undisputed evidence that definitively establishes the history of these lines?  Neither party presents alternative evidence concerning the Manzanita line.  For the purposes of this motion,

**41**

neither party has established the date on which the Manzanita line first began to bill SCE employees living at Big Creek as retail customers.

SCE presents one piece of alternative evidence concerning when the Snocat line began to serve retail customers in and around Shaver lake:  an excerpt from a book, Reflections of Shaver Lake.  (Kimball Dec., Ex. H.)  On page 121 of that book, the author provides a three-page "Shaver Lake Chronology" covering the period of time from 5000 B.C. to 1983.  The entry for 1935 reads: "The dark ages end as electricity arrives at Shaver Lake Heights."  *Id*. at 123.  Setting aside Plaintiff's many evidentiary objections to SCE's reliance on this excerpt, it is simply not dispositive of the critical question:  When did the Snocat line began to serve retail customers?  The Chronology entry does not provide any details concerning the provision of power to Shaver Lake Heights, let alone whether that power was even provided by SCE.  For the purposes of this motion, neither party has established the date on which the Snocat line first began to serve retail customers.

The factual backdrop for the Stevenson line is more complex. Independent of Mr. Prehiem's statements concerning the Stevenson Line, SCE presents a declaration from the operators of the Mammoth Pool Resort.  It appears to be undisputed that the Resort is served by the Stevenson line.  Its operators, Nelda and

**42**

Weymond Wagner state that they have paid monthly bills to SCE since 1958.  (SCE UF #33; Wagner Dec. ¶¶2-5.)  In addition to raising several objections to the evidence presented by the Wagners, the United States points to an important independent fact that appears to be undisputed: The location of all the retail customers SCE alleges are served by the Stevenson line, is beyond where the Stevenson line passes from the 12kV substation to powerhouse 8 and draws power from that source.  (*See* USA's Objections to SCE's UF #30.)  Although no party provides expert testimony that permits legal analysis of this electrical fact, it is enough to raise questions as to the "primary purpose" of that portion of the Stevenson line extending from the 12kV substation to powerhouse 8.  Accordingly, the "primary purpose" of the Stevenson line cannot be determined as a matter of law on this record.

The disputed nature of these facts makes it improper to grant summary judgment to either party on this issue.

### 5.  What is the relationship between the 12kV transformers and these lines?

The character of the three lines emanating from the 12kV substation is a threshold issue to the factual inquiry:  Assuming at least one of the lines serves residential customers and could be considered part of the distribution system, what relationship

do the 12kV transformers have to this line?  Do the transformers feed directly into the line (like the line excluded from FERC jurisdiction in *Lockhard*) or do the transformers feed into a 12kV bus which is the point of junction?

A critical electrical diagram, the "One Line for Operation," SCE 004857, appears to indicate that the 12kV transformers connect to the Snocat, Stevenson, and Manzanita lines though at least one and possibly two separate busses.  During oral argument on these motions, counsel for both parties expounded upon the nature and effect of these pieces of electrical equipment.  This discussion is not evidence.  Although the report prepared by Plaintiff's expert Kevin Mara, does discuss the existence of a bus, his report has been stricken.  Even if Mr. Mara's report was considered by the court, it does not clarify the situation, for it does not delineate between the transformers and the bus in any way that permits application of the *Lockhart* and *Montana* rule.  No other record evidence bears on this subject or provides sufficient detail concerning the electrical relationship between the 12kV transformers and the three lines which currently emanate from the substation.

//

//

//

**44**

**B.    Does the 12kV Transformer Fall Within FERC's Jurisdiction by Virtue of SCE's Occupancy and Use of Reserved Federal Lands?**

The United States suggests that, regardless of the scope of FERC's jurisdiction under the cases discussed above at Part V.A.3, the 12kV transformer falls under FERC's jurisdiction because the enclosure lies on federal lands reserved to the Sierra National Forest.  The United States points to 16 U.S.C. § 817(1) in support of the proposition that FERC has mandatory licensing jurisdiction over the transformer.  Section 817(1) provides:

> It shall be unlawful for any person, State, or municipality, for the purpose of developing electric power, to construct, operate, or maintain any dam, water conduit, reservoir, power house, or other works incidental thereto across, along, or in any of the navigable waters of the United States, ***or upon any part of the public lands or reservations of the United States*** (including the Territories), or utilize the surplus water or water power from any Government dam, except under and in accordance with the terms of a permit or valid existing right-of-way granted prior to June 10, 1920, or a license granted pursuant to this chapter....

16 U.S.C. § 817(1).  But, this provision simply reinforces the undisputed proposition that FERC has jurisdiction to authorize hydroelectric projects on federal lands.  It does not speak to the critical question, whether the 12kV transformer is a "project work."  In other words, § 817(1) does not apply unless Transformer No. 2 is a "dam, water conduit, reservoir, power

45

house, or other works incidental thereto."

The United States also relies heavily on language from FERC's decision in *Southern California Edison* Co., 106 F.E.R.C. 61,212, 61,711 (2004). In that case, the Commission examined whether it had licensing authority over a hydroelectric project on federal lands that was temporarily out of operation. SCE argued in that case that FERC no longer had jurisdiction over the project because it was no longer being operated. In rejecting that argument, FERC stated that "hydroelectric projects that are located on any part of U.S. lands or reservations fall under the Commission's mandatory licensing jurisdiction." FERC clarified in a footnote that "[i]f any part of a hydroelectric project is located on U.S. lands or reservations, the entire project must be licensed." *Id*. at n.21.

The United States' reliance on this rule is misplaced. FERC's jurisdiction over a project on federal lands is still limited by the statutory definition of the term "project." Although FERC may have licensing authority over an entire project even if only part of the project is located on federal land, FERC still lacks authority over <u>equipment</u> that cannot be considered part of the "project works" under the FPA, such as those pieces of equipment which form the point of interconnection with the primary transmission system. Plaintiff presents no legal authority to the contrary.

**46**

**C. Even If the 12kV Transformer Does Not Fall Within FERC's Jurisdiction, May the United States Nevertheless Recover Under the Terms of the License?**

Both of the licenses at issue in this case contain identical language:

> The Licensee shall be liable for injury to, or destruction of, any buildings bridges, roads, trails, lands or other property of the United States, *occasioned by* the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto *under the license*...

Project 2175 License, Form L-5, Art. 19; Project 67 License, Form L-1, Art. 24 (emphasis added).[13]  The United States argues that the indemnity provisions in the licenses operate against SCE even if the 12kV transformer is not expressly covered by either of the licenses.[14]  To support its argument, the United States relies heavily on the fact that Articles 19 and 24 use language that is almost identical to that found in 16 U.S.C. § 803(c).  Section 803(c) operates to impose liability on a FERC licensee for all damage to the property of third parties occasioned by the

---

[13]    FERC licenses are to be interpreted and enforced under the general principles of federal contract law.  *Cal. Power Agency v. Pac. Gas & Elec. Co.*, 104 FERC 63,029, 2003 WL 21796229; *see also Utah Power & Light Co. v. United States*, 243 U.S. 389, 403-04 (1917).

[14]     Although the court previously ruled that the license conditions are valid and enforceable against SCE.  *See United States v. Southern California Edison*, Co., 300 F. Supp. 2d 964,982 (E.D. Cal. 2004); this ruling preceded SCE's successful effort to withdraw its admission that the licenses applied to the 12kV substation.

licensed operations, and requires every FERC license to include language imposing liability on the licensee for third party property damage.

But, critically, the plain language of the Articles 19 and 24 does not extend liability beyond the reach of the FERC license. In fact, it specifically conditions the liability upon coverage under the license:

> The Licensee shall be liable for injury to...lands or other property of the United States, *occasioned by* the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto *under the license*." (Emphasis added.)

Here, there is no dispute that the fire began in the 12kV transformer, but there is considerable dispute over whether that piece of equipment was covered by the license. Replacing the phrase "occasioned by" with the phrase "caused by" does not erase this conditional language.

Moreover, section 803(c) limits itself to equipment "constructed under the license":

> Each licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto, *constructed under the license*, and in no event shall the United States be liable therefor.

The language of this provision begs the same question: Is the particular facility that caused the damage covered by the license?

**D. Assuming the Terms of the Licenses Do Not Apply, Is SCE Civilly Liable For Operating the 12kV Transformer in Violation of Federal Law?**

The United States argues that "[if] the 12kV substation is not licensed under the Project 2175 or 67 licenses, SCE has operated and maintained the 12kV substation in trespass on federal lands, in violation of at least the Federal Power Act [] and applicable Forest Service regulations." (Doc. 257 at 19.)

### *a.   Violation of the Federal Power Act.*

Assuming that the terms of the licenses do not apply to the 12kV substation or transformers, the United States maintains that SCE's operation of this equipment without a FERC license violates the terms of the Federal Power Act, which provides:

> It shall be unlawful for any person...for the purpose of developing electric power, to construct, operate, or maintain any dam, water conduit, reservoir, power house, or other works incidental thereto...upon any part of the public lands or reservations of the United States (including the Territories)...except under and in accordance with the terms of...license granted pursuant to this chapter.

16 U.S.C. § 817. Again, reliance on this provision begs the question of whether the substation and/or any transformer therein is "a dam, water conduit, reservoir, power house, or other works incidental thereto." If, as SCE maintains, the substation and/or transformers are <u>not</u> covered by the terms of § 817, the operation of that equipment does not require a license. As discussed above, there are disputed material facts that make it impossible

**49**

to determine at this time whether the substation and/or the transformers are covered by this definition.  Accordingly, it would be similarly inappropriate to find as a matter of law that SCE violated the FPA by operating this equipment without a license, despite the government's contention that no equipment of any kind can be lawfully sited on U.S. government land.

### b.   Violation of applicable Forest Service laws and regulations.

The United States next points to 16 U.S.C. § 551, which enables the Secretary of Agriculture to regulate the "use and occupancy" of National Forests and to preserve the National Forests from destruction by fire.[15]  More specifically, the

---

[15]   16 U.S.C. § 551 provides in full:

The Secretary of Agriculture shall make provisions for the protection against destruction by fire and depredations upon the public forests and national forests which may have been set aside or which may be hereafter set aside under the provisions of section 471 of this title, and which may be continued; and he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction; and any violation of the provisions of this section, sections 473 to 478 and 479 to 482 of this title or such rules and regulations shall be punished by a fine of not more than $500 or imprisonment for not more than six months, or both. Any person charged with the violation of such rules and regulations may be tried and sentenced by any United States magistrate judge specially designated for that purpose by the court by which he was appointed, in the same manner and subject to the same conditions as provided for in section 3401(b) to (e) of Title 18.

**50**

government points to implementing regulations set forth at

36 C.F.R. Part 261.  The provision on which the government

principally relies is 36 C.F.R. § 261.10(a), which prohibits

> Constructing, placing, or maintaining any kind of road, trail, structure, fence, enclosure, communications equipment, or other improvement on National Forest System lands or facilities without a special use authorization, contract, or approved operating plan, unless such authorization, contract, or operating plan is waived pursuant to § 251.50(e) of this chapter.

(emphasis added).[16]  It is a misdemeanor to violate this

provision.  16 U.S.C. § 551.

Assuming the licenses do not apply, the United States argues

that it cannot be disputed that SCE was operating the 12kV

substation on federal lands in violation of this provision.  In

support of this assertion, the United States maintains that the

following facts are undisputed:

> (i) the 12kV substation is located on national forest land; (ii) SCE would have been required to obtain an approved special use authorization to use, operate or maintain the 12kV substation if the FERC licenses did not apply (or to dismantle the 12kV substation if no such permit were granted), (iii)(no authorization (other than the Project 2175 and 67 licenses) permitted SCE's use, operation, or maintenance of the 12kV

---

[16]    The United States also references separate provisions that prohibit "[c]ausing timber, trees, slash, brush or grass to burn except as authorized by permit," 36 C.F.R. § 261.5(c), and other related regulations.  *See* 36 C.F.R. § 261.6(a) (prohibiting damaging any timber, tree, or other forest product except as authorized by a special use permit, contract or other federal law or regulation), and § 261.9(a) (prohibiting damaging any natural feature or property of the United States).

1
2
                    substation on National Forest land, and (iv) the Big
                    Creek Fire ignited as a result of the operation of an
                    SCE transformer located within the 12kV substation.
3       (Doc. 257, at 21-22 (citations omitted)).

4           SCE objects generally that civil liability for damages
5
        cannot be imposed under this (or any similar) regulation, citing
6
7       *Aldabe v. Aldabe,* 616 F.2d 1089, 1092 (9th Cir. 1980), which
8       holds that a criminal provision does not provide a basis for
9       civil liability.  The United States, in its reply brief, responds
10      by citing to *United States v. Langley*, 587 F. Supp. 1258, 1265
11      (E.D. Cal. 1984), and *United States v. Hells Canyon Guide Serv*.,
12
        Inc., 660 F.2d 735, 736-38 (9th Cir. 1981), each of which
13
14      supports the unsurprising proposition that the government may
15      seek to enforce Forest Service regulation by injunction.[17]  The
16      United States points to no authority to support its contention
17      that violation of a land management regulation renders the
18      violator liable for damages arguably caused by that violation.
19      Perhaps these regulatory violations support civil liability under
20
        a trespass theory, but the United States does not provide any
21
22      legal authority suggesting as much.  SCE's motion for summary
23      adjudication that it cannot be liable in damages for violation of

24
            [17]    The United States focuses unwarranted attention on a
25      quote from *Langley* where the district court stated that "[f]orest
26      service regulations may be enforced in federal district court by
        injunction or ***otherwise***."  587 F. Supp at 1265.  But, a footnote
27      following this quote suggests that the "otherwise" is a reference
        to the criminal sanctions which may be imposed under 16 U.S.C.
28      § 551.  *See id.* at 1265 n.11.

these Forest Service regulations, whether injunctive relief is
appropriate, must await trial.

   **E.   Is SCE Liable in Trespass for Damage Caused by the Big
         Creek Fire?**

   "Trespass is the intentional use of the property of another
without authorization and without privilege." *United States v.
Imperial Irrigation Dist.*, 799 F. Supp. 1052, 1059 (S.D. Cal.
1992).  "Trespass entitles the plaintiff to nominal damages as
well as compensatory damages in an amount that will compensate
for all detriment *proximately caused*."  *In re Burbank Envtl.
Litig.*, 42 F. Supp. 2d 976, 984 (1998)(citing *Costerisan v. Tejon
Ranch*, 255 Cal. App. 2d 57 (1967)).[18]

   In California, "proximate cause" or "legal cause" exists if
the actor's conduct is a "substantial factor in bringing about
the harm and there is no rule of law relieving the actor from

────────────

   [18]   The United States mistakenly relies upon *Hammond v.
County of Madera*, 859 F.2d 797, 804 (9th Cir. 1988) for this same
legal rule.  The plaintiff in *Hammond* owned an Indian land
allotment.  Trespass onto Indian lands is one of the rare
instances in which a trespass cause of action is governed by
federal common law, not state law.  *See United States v. Pend
Oreille Public Utility Dist. No. 1,* 28 F.3d 1544, 1550 n.8 (9th
Cir. 1994)("The Supreme Court has recognized a variety of federal
common law causes of action to protect Indian lands from
trespass, including actions for ejectment, accounting of profits,
and damages."); *see also County of Oneida v. Oneida Indian
Nation*, 470 U.S. 226, 234 (1985) (right of Indians to occupy
lands held in trust by the United States for their use is "the
exclusive province of federal law").

liability." *Lombardo v. Huysentruyt*, 91 Cal. App. 4th 656, 665-66 (2001)(applying proximate cause standard in medical malpractice case).

> The doctrine of proximate cause limits liability; i.e., in certain situations where the defendant's conduct is an actual cause of the harm, he will nevertheless be absolved because of the manner in which the injury occurred. Thus, where there is an independent intervening act which is not reasonably foreseeable, the defendant's conduct is not deemed the "legal" or proximate cause. In general, if the risk of injury is reasonably foreseeable, the defendant is liable. An independent intervening act is a superseding cause relieving the actor of liability for his negligence only if the intervening act is highly unusual or extraordinary and hence not reasonably foreseeable.

*Id.* "Causation is generally a question of fact for the jury, unless reasonable minds could not dispute the absence of causation." *Id.; see also Commodities Reserve Co. v. St. Paul Fire & Marine Ins. Co.,* 879 F.2d 640, 644-45 (9th Cir. 1989)("We recognize that proximate cause generally is an issue for the jury.").

The United States maintains that the normal rules concerning proximate cause do not apply to an intentional trespasser. Rather, a trespasser is liable for all damages its operation inflicted to the property during the trespass. The United States relies upon the following language from *Miller v. National Broadcasting Co.*, 187 Cal. App. 3d 1463, 1481 (1986):

> Quite frequently [] the [trespasser] has been held liable for indirect consequences, some of which have

> not been reasonably foreseeable, of conduct engaged in
> while trespassing.... It is important to realize that
> those who use another's land without permission may
> justifiably have "risks of loss" allocated to them far
> beyond those normally imposed when liability is imposed
> on a negligence theory.

This passage appears to severely restrict any defenses based upon foreseeability.[19]

SCE responds by pointing to *McKenzie v. Pacific Gas 7 Elec. Co.*, 200 Cal. App. 2d 731 (1962).  In that case, the court rejected a claim for strict liability for trespass.  Plaintiff was injured when a television tower he was lowering came into contact with power lines operated by defendant.  The lines encroached upon Plaintiff's property, so that defendant was considered to be trespassing.  The court reasoned that strict liability was only appropriate where the "act of trespass alone

---

[19]   The United States points out that *Miller* is consistent with the Restatement (2d) of Torts § 162, which provides that a trespasser is liable for all damages "to the land or to [the owner's] things... caused by any act done, activity carried on, or condition created by the trespasser, irrespective of whether his conduct is such as would subject him to liability were he not a trespasser."   The United States further points to the following illustration from the § 162 fo the Restatement:

> A is driving his car along the highway in a
> neighborhood with which he is unfamiliar. He asks B to
> direct him to a certain town. B tells him that he can
> take a short cut through a private road over which the
> public is not accustomed to travel, which B asserts to
> be upon his own land but which, in fact, is on the land
> of C. While driving carefully along the road, A runs
> over D, C's three-year-old child, who suddenly dashes
> out from the bushes which border the road. A is subject
> to liability to D and to C.

caused the injury."  Because the injury in *McKenzie* was caused by "when the tower was lowered into contact with defendant's wires" the court found that the encroachment did not "in and of itself" cause the damage."  *Id*. at 737.  The court held that:

> It is true the trespass created a condition which was a factor in the accident, but this did not thrust absolute liability upon defendant. The trial judge correctly analyzed the situation in regard to the trespass when he commented, "It is like saying that if I had driven 40 miles an hour instead of 30 miles an hour, I wouldn't have been in the intersection when I got hit."

*Id.*

In contrast, the facts in *Miller*, the case relied upon by the government, are quite different.  In *Miller* a television camera crew entered a home, without the residents' consent, accompanying paramedics who tended to a man within the residence, who later died.  The station broadcast film of the incident without obtaining consent of the residents.  The *Miller* court found that the camera crew had made an unauthorized entry into the residence which constituted a trespass.  187 Cal. App. 3d at 1481.  The court then held that the trespassers would be liable for a wide range of damage caused by that unlawful entry, including the emotional distress which resulted.  *Id*.  Unlike in *McKenzie*, the trespass in *Miller* did "in and of itself" cause the injury.

The question here is: Assuming that SCE unlawfully operated the substation in trespass, did that trespass "in and of itself"

**56**

cause the fire.  It is not disputed that the fire was sparked because an unfortunate rodent[20] came into contact with one of the 12kV transformers.  The presence of the transformer was not "in and of itself" the cause of the fire.  It is necessary to explore whether the presence of the transformer was the proximate cause of the fire, following the rules set forth in cases like *Lombardo*, 91 Cal. App. 4th at 665-66, discussed above.  The record is not sufficient to even begin an inquiry into the reasonable foreseeability of the squirrel's contact with the transformer and the condition of the transformer which made it susceptible to vaporizing the squirrel.

### F.   Is SCE liable for damages under California Health and Safety Code § 13007?

Finally, the United States seeks summary judgment on the ground that "[i]f the Project 2175 and 67 licenses did not authorize the 12kV substation, SCE is liable as a matter of law under California Health and Safety Code sections 13007, 13009, and 13009.1."  (Doc. 257 at 22.)

Section 13007 assigns liability for damage caused fire:

> Any person who personally or through another wilfully, negligently, *or in violation of law*, sets fire to,

---

[20]   For a description of the life and times of a more fortunate member of the genus *sciurus*, *see Pennsylvania v. Gosselin*, 2004 Pa. Super. 426 (Nov. 5, 2004).

1
2
3

> allows fire to be set to, or allows a fire kindled or
> attended by him to escape to, the property of another,
> whether privately or publicly owned, is liable to the
> owner of such property for any damages to the property
> caused by the fire.

4

5   Section 13009(a) provides a cause of action for the recovery

6   of fire suppression costs.

7
8
9
10
11
12
13
14

> Any person [] who negligently, ***or in violation of the
> law***, sets a fire, allows a fire to be set, or allows a
> fire kindled or attended by him or her to escape onto
> any public or private property...is liable for the fire
> suppression costs incurred in fighting the fire and for
> the cost of providing rescue or emergency medical
> services, and those costs shall be a charge against
> that person. The charge shall constitute a debt of that
> person, and is collectible by the person, or by the
> federal, state, county, public, or private agency,
> incurring those costs in the same manner as in the case
> of an obligation under a contract, expressed or
> implied.

15

16   Section 13009.1 similarly assigns liability for the costs of

17   investigating the fire and any costs related to accounting for

18   damages caused by the fire.

19
20   It is appropriate for the United States to rely upon

21   provisions of the Health and Safety Code as a basis for a claim

22   to recover damages to National Forest land caused by fire and/or

23   to recover associated fire suppression and investigation costs.

24   *See United States v. State of Cal.*, 655 F.2d 919-20 (9th Cir.

25   1980).  The question remains, however, whether the United States

26   is entitled to summary judgment on these claims.

27
28   The parties do not agree on the essential elements that must

**58**

be proved to recover under the Health and Safety Code provisions. The United States asserts that liability is established where a party (1) acts in violation of law, and (ii) sets a fire, or allows a fire to be set, on the property of another.  The United States further asserts that these elements have been conclusively established in this case, because (a) if the licenses do not apply to the 12kV substation and SCE did not possess a special use permit, SCE was acting in violation of the law; and (b) SCE "allowed the Big Creek Fire to be set by its operation of the transformer."  The government places great emphasis on the "or in violation of the law" language in the cited Health & Safety Code provisions, and suggests that a party operating equipment in violation of any applicable law is subject to strict liability for any damage caused by a fire sparked by that equipment.  The United States does not, however, point to any caselaw imposing strict liability under these provisions.  The only case cited by the *United States is Ventura County v. S. Cal. Edison Co.*, 85 Cal. App. 2d 529, 533 (1948), which concerned a claim that a party acted negligently and, accordingly, did not impose strict liability.

SCE suggests that a party can only be liable under sections 13007, 13009, and 13009.1 if its wrongful conduct was the proximate cause of defendants harm, citing *People v. Southern California Edison Co.*, 56 Cal. App. 3d 593, 605 (1976).  None of

**59**

the statutory provisions cited by Plaintiff suggest that strict liability is the standard.  The issue of causation remains for trial, summary judgment on the United States' claims under the California Health and Safety Code is not appropriate at this stage.

<b>VI.   <u>CONCLUSION</u></b>

For the reasons set forth above,

(1)   The United States' motion for summary judgment is **DENIED** in its entirety; and

(2)   SCE's motion for summary judgment is **DENIED** in its entirety.


**SO ORDERED.**

**Dated: February 6, 2006**


                           **_/s/ OLIVER W. WANGER**
                               **Oliver W. Wanger**
                           **UNITED STATES DISTRICT JUDGE**